LOUIS SHERRY *vs.* WAKEFIELD INSTITUTION FOR SAVINGS.

WASHINGTON—JANUARY 25, 1899.

PRESENT: Matteson, C. J., Stiness and Tillinghast, JJ.

(1)    *Redemption of Mortgaged Estate.    Allowance in Accounting.*

A. sold mortgaged property to B. and the latter assumed payment of the mortgage debt; B. mortgaged the same property back to A. for a sum inclusive of the first incumbrance, and A. agreed to have the same discharged.    Subsequently B. made another mortgage of the estate to C., and from its proceeds the latter undertook to pay off all prior incumbrances thereon.    C. paid to A. the amount of B.'s mortgage to him, but the latter did not pay the first mortgage, and afterwards became insolvent.    The treasurer of C. acted as attorney for A., and became informed

of the outstanding first mortgage at a time when, if C. had communicated the facts to B. the latter might have protected himself. B. supposed all incumbrances upon his property had been discharged, except his mortgage to C.; he did not learn the fact until after the insolvency of A., and was then compelled to pay the first mortgage debt. On a bill to redeem by B. against C., praying that in the accounting he be allowed the sum paid by him to discharge the estate from the first mortgage lien:—

*Held,* that, if C. knew, or ought to have known, that the money retained by it did not wholly belong to A., it should not have been paid to him, and such payment would be a misapplication of the fund.

*Held,* further, that as B. gave to C. notice of A.'s mortgage, but did not mention the prior incumbrance, C. had not misapplied the fund.

(2) *Fiduciary Relation.   Duty of Giving Notice.*

*Held,* further, that under the circumstances it became the duty of C. to give B. notice of the facts it had learned, in order that he might protect himself.

*Held,* further, that failure to discharge this duty made C. responsible, and that B. was entitled to an allowance, in the accounting, for the loss he had sustained thereby.

(3) *Principal and Agent.*

A principal is liable for the acts and for the omission of duty of his agent, within the scope of his employment.

This rule is peculiarly applicable to corporations, which act only through officers and agents, and notice to such officer or agent in the transaction for which he is employed is notice to the corporation.

When a borrower of money knows of an outstanding incumbrance upon real estate which he offers as security for the loan, it is as much his duty to give notice thereof to the lender as it is for the latter to find it out.

BILL IN EQUITY to redeem, coupled with a prayer that, in the accounting, complainant be allowed a sum which he had been compelled to pay because of the fault of the mortgagee relative to a prior mortgage. Heard on bill, answer, and proofs.

(1)   STINESS, J.   By deed, dated January 1, 1888, Edward Earle sold to the complainant two lots of land at Narragansett Pier, subject to a mortgage to Anna Hazard, dated December 19th, 1887, for the sum of $34,000, "which as a part of the consideration of this conveyance the present grantee assumes and shall satisfy to the amount and in the proportion which the total area of the land hereby conveyed bears to the total area covered by said mortgage." The deed was

delivered April 24, 1888, at which time the complainant gave to Earle a mortgage on the same land to secure a note for $12,083.35, with a verbal agreement that the sum paid to discharge the land from said Hazard mortgage should be deducted from the amount due on the note, and the balance only to stand as the mortgage debt.    Although Sherry thus assumed the payment, the understanding seems to have been that Earle was to ascertain the amount and pay it out of the proceeds of the mortgage.    In other words, Sherry trusted the whole matter to Earle to get a clear title.    The complainant having arranged with the respondent in September, 1888, for a loan of $25,000, to be secured by mortgage on the property, it was executed June 7, 1889, in which the deed from Earle to Sherry was referred to and "made part hereof and the conditions and covenants running therewith." Then followed full covenants of warranty, including a covenant against other mortgages and incumbrances.

The bill alleges that, for the protection of the respondent, it was agreed that the bank should pay off all prior incumbrances on the property out of the loan and pay the balance over to the complainant, after such payment; its secretary, treasurer, and director, John E. Babcock, acting for the bank in these transactions.

Under this arrangement the bank transferred to Earle's credit the amount due on the mortgage from Sherry, $12,-211.81, which was cancelled June 14, 1889, by said Babcock as attorney for Earle, and the balance accounted for to Sherry. This left the Hazard mortgage still outstanding on the property, and Sherry was obliged to pay the sum of $7,140.42 in January and February, 1894, to redeem his land from that mortgage.    He now brings this bill to redeem his mortgage to the bank, and the only question is whether he is entitled to deduct from the amount due the sum that he was obliged to pay on the Hazard mortgage.

There is no doubt that as between Earle and Sherry it was agreed, notwithstanding the assumption of a proportionate part of the Hazard mortgage by Sherry, that it was, in fact, to be paid by Earle out of the proceeds of Sherry's mortgage

to him.  The conveyancing in this respect was extremely loose and almost incomprehensible, but the agreement sufficiently appears in the testimony of both parties.   We come, then, to the question whether there was such knowledge of this agreement on the part of the bank as to make it chargeable with a misapplication of the funds reserved for the payment of the Earle mortgage.   It is not a question of estoppel by the covenants of warranty, for the complainant admits that the mortgage given to the bank was to be a first mortgage.   He bases his case upon an agreement to that effect, by which he claims that the bank assumed to discharge all prior mortgages and retained the money necessary to do so. If the bank knew or ought to have known that the money so retained did not wholly belong to Earle, it should not have been paid to him, and for a payment so made it would be responsible for a misapplication of the fund.   A principal is liable both for the acts and for the omissions of duty of his agent, within the scope of his employment.   This rule is peculiarly applicable to corporations, which act only through officers and agents, and notice to such officer or agent in the transaction for which he is employed is notice to the corporation.   Ang. & A. Corp. §§ 305, 310, 311.

The management of the business in question was in the hands of the secretary and treasurer, John E. Babcock, who was also a director.   The understanding on both sides was that the mortgage to the bank was to be a first mortgage, and that the necessary amount was to be retained and applied to the discharge of prior incumbrances.

The trouble in this case has arisen from the fact that the mortgage to Earle really, but not in terms, covered all incumbrances, because the Hazard mortgage on the lots sold was included in its amount.

When Sherry applied to the bank for the loan of $25,000 he made no statement in writing of existing incumbrances, but testifies that he stated to the directors: " That there was a mortgage of $12,083, and that I wished all claims released, and to give them a first mortgage of $25,000."   He assumes that this cast upon the bank the duty to clear off all prior

mortgages.    But it was as much his duty to give notice of an incumbrance, which he knew of, as it was for the bank to find it out.    As he only gave notice of Earle's mortgage, and as the testimony does not satisfactorily show that Babcock knew of the arrangement between himself and Earle when the payment was made, we do not find that the bank, up to this point, is liable for a misapplication of the fund.    Stress is laid upon the fact that as, in May, 1889, before the execution of the mortgage to the bank, and in November, 1889, after its execution, Babcock, as attorney for Earle, paid interest for him on the Hazard mortgage, he must have known that it covered these lots.    In a letter to Earle, dated January 16, 1890, Babcock said :    "I have never known on what exactly the $40,000 or $32,000 mtg. of Hazard was on, only *guessed* it was on the 10 acres & part of other."    Still this falls short of notice actual or implied, since, as we have said, his attention had only been directed to the Earle mortgage. It settles the fact, however, that from this date he did know that the Hazard mortgage covered the Sherry lots, for he adds:    "Certainly, then, our mtg. is not *first.*"

In a letter written by Babcock to Earle, January 29, 1890, after figuring out the proportionate amount of the. Hazard mortgage on Sherry's lots, he said:    "Therefore to relieve lots of Sherry's on 'H,' payment $7244.82 & $1477.18, or $8722, eight thousand seven hundred and twenty-two dollars, then the mortgage could be cancelled or rather released from 'H' (Release on Wolff's 1 a + already been given) and the 3 a + of Sherry's cottage lots.    I figured all the above carefully & think same correct."

(2)    We think that this letter clearly implies knowledge by Babcock, at that time, of the arrangement about the mortgage, and that he had overpaid Earle to the extent stated. It also implies that he knew that Earle was to make the payment "to relieve lots of Sherry's."    What was his duty under the circumstances?    Earle was at that time in good credit, and he says that he could have paid the above amount and did not know that it had not been paid, prior to Babcock's letter of January 16, 1890.    From May 28, 1890, to

July 8, 1890, he had a daily balance in the Wakefield National Bank and Trust Co., of which Babcock was treasurer, from which account Babcock drew checks as attorney for Earle, varying from $8,000 to $11,000, and he also had several tracts of real estate, deeds of which were executed by Babcock, as his attorney, out of which this claim might have been secured. Sherry had no knowledge that the Hazard mortgage was outstanding on his property, because he had not been called upon for interest, which was paid by Earle. It is evident that he understood that the Hazard claim had been paid. The bank stood in a fiduciary relation to him, with reference to the payment which it assumed to make, and although, from lack of notice, it may have been free from fault in paying as it did, still, upon learning the mistake, its least measure of duty, in honesty and good faith, was to give notice to Sherry of the facts, in order that he might take steps to protect himself. According to Earle's testimony, and Babcock's knowledge of Earle's funds in bank, Sherry could have been protected had seasonable notice been given. But no notice was given. On the contrary, Babcock went on paying interest for Earle on the Hazard mortgage, thus keeping Sherry in the dark, until he ceased to be Earle's attorney, in August, 1891. Sherry received no notice of the state of things until 1893, when Earle had become insolvent and the Hazard mortgage was about to be foreclosed, nor did Babcock notify the directors of the bank until that time. The reason that Babcock gives for his silence is this: "I thought Mr. Earle would attend to it himself. He had everything else up to that time. I had so much confidence in him, I supposed whatever adjustment was to be made he would arrange it." Earle continued to make promises up to the time of foreclosure, and Babcock remained silent. The respondent argues that Babcock's knowledge could not have the effect to throw upon the bank the obligation to do what the complainant neglected to do, insist upon the settlement of the proportionate part of the Hazard mortgage before it settled the Earle mortgage. This we have already said. The bank undertook to pay Earle so as to leave its own mortgage first,

and it did so by simply giving him credit in the Wakefield National Bank, managed practically by the same officers, without making any inquiry of him, which we think was excusable under the circumstance. If the matter had ended there, we do not see that the bank could have been held responsible. Having, however, undertaken the payment which was then supposed, both by complainant and respondent and assented to by Earle, to cancel the prior incumbrances, and having subsequently learned of the mistake in the matter, the bank, through Babcock, its treasurer, continued to receive payments from Sherry, without giving him notice, and leaving him to suppose that it was the full interest on all mortgage debts on his property, until he lost his chance of recovery from Earle. We think the bank then made itself responsible. Babcock was the authorized agent of the bank and acting within the line of his office and employment.

The case differs from *McCulla* v. *Beadlestone,* 17 R. I. 20, on substantial facts. In that case the claim of overpayment was denied ; so that an injunction, if granted, would compel a delay until the decision of questions which might show that there was no ground for delay. Moreover, the mortgage originated outside the business of the defendant firm, in which it was claimed that the overpayments arose, and so the mortgage stood by itself. Again, the court found in that case that there was no relation of trust between the parties.

The case is more like *Frieze* v. *Chapin,* 2 R. I. 429, in which a mortgagee of stock in a corporation, who was also treasurer of the corporation, refused to give information affecting the value of the stock. The court granted the injunction as to the sale of stock until the respondent should communicate all the knowledge he had of the affairs of the company. An injunction against the sale of real estate was denied on the ground that the claim set up for allowance towards the satisfaction of the mortgage was against the company and not against the mortgagee, and it was also a disputed claim.

Mr. Babcock testifies that he did not know that the pro-

portionate amount of the Hazard mortgage was to be paid by Earle out of his mortgage until the filing of this bill. From the statements in the letters quoted, from his payment of interest as attorney for Earle after he knew of the incumbrance on this land, and from his statement in a letter dated May 24, 1894, in which he says that he first knew about the mortgage on all of the property when Earle asked him "to figure out some interest proportionally on some part of his property," and that he went to the records and "saw the amount and what on," it appears that this statement is a mistake.

We think that the complainant is entitled to an allowance, in accounting, for his loss by the neglect of duty by the respondent, through its treasurer.

*Albert B. Crafts*, for complainant.

*James Tillinghast, William R. Tillinghast, and Theodore F. Tillinghast*, for respondent.

